UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHAEL L. MENTZER )<br>2874 Station Road )<br>Middletown, MD 21769, )<br>)<br>    and )<br>)<br>LEO W. SCULLY, JR. )<br>12507 Kings Lake Drive )<br>Reston, VA 20191, )<br>)<br>*Plaintiffs*, )<br>)<br>    v. )<br>)<br>CHARLES H. RAMSEY )<br>in his official capacity as )<br>CHIEF OF THE )<br>METROPOLITAN POLICE )<br>    DEPARTMENT )<br>300 Indiana Avenue, NW )<br>Washington, DC 20001, )<br>)<br>*Defendant*. )<br>_____) | | Civil Action No. |

**COMPLAINT**
**(Employment retaliation in violation of the**
**federal Civil Rights Act, D.C. Human Rights Act,**
**and the D.C. Whistleblower Protection Act)**

1. This action is brought by two members of the District of Columbia Metropolitan Police Department (MPD) for retaliation and discrimination by their employer, in violation of the federal Civil Rights Act, D.C. Human Rights Act, and the D.C. Whistleblower Protection Act.

2. Officer Mentzer and Sgt. Scully are committed police officers with decades of experience. However, when they began to complain of discrimination and mismanagement at the MPD, and more specifically at the Horse Mounted Unit, they were targeted for harassment, subjected to sham investigations and unjustifiably low performance evaluations, and transferred to less favorable assignments.

**Parties**

3. Plaintiff Michael L. Mentzer is a resident of the state of Maryland and an employee of the Metropolitan Police Department of the District of Columbia, where he has worked as an Officer since February 1991.

4. Plaintiff Leo W. Scully, Jr. is a resident of the commonwealth of Virginia and an employee of the Metropolitan Police Department of the District of Columbia, where he has worked since August 1990. He has held the rank of Sergeant since 1999.

5. Defendant Charles H. Ramsey is the Chief of the Metropolitan Police Department of the District of Columbia and a policymaker for the MPD, and is sued in his official capacity.

**Jurisdiction and Venue**

6. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

7. Venue is proper pursuant to 28 U.S.C. § 1391 because the Defendant resides in the District of Columbia and because the events giving rise to these claims occurred in the District.

**Facts Common to All Counts**

8. Both Plaintiffs Scully and Mentzer were exceptionally committed to creating, and remain committed to developing and maintaining, a professionalized horse unit for the MPD.

9. Plaintiff Scully has been with the MPD's Horse Mounted Unit (HMU) since the Unit's formation. After applying and being interviewed, he was selected in February 2001 as the number one candidate for the position of Sergeant with the Mounted Patrol.

10. In addition to the required training, Plaintiff Scully undertook further education regarding horses and mounted patrol tactics, at his own expense and due only to his extraordinary commitment to the success of the HMU.

11. Plaintiff Mentzer began with the HMU in 2002 as an Officer.

12. In addition to the required training, Plaintiff Mentzer undertook further education regarding horses and mounted patrol tactics, at his own expense and due only to his extraordinary commitment to the success of the HMU.

13. Plaintiffs have engaged in a variety of activities to expose and seek redress of mismanagement, waste of public resources, abuse of horses, and discrimination and retaliation. These activities ranged from informal discussion to formal meetings to filing charges of discrimination.

14. Beginning in 2002, Plaintiffs became particularly concerned with the management and operation of the HMU.

15. Plaintiffs formed a citizens group and spoke with members of the D.C. City Council as well as officials at MPD about the stabling of horses used by the HMU. They expressed concern that, among other matters, City funds were being wasted in paying rent for stabling the horses rather than placing the horses at a City-owned facility.

16. Plaintiffs met on a number of occasions with City Councilmember Jim Graham, officials from the Office of Planning, and MPD officials including Chief Ramsey.

17. Plaintiffs ultimately identified a stable (the historic Cavalry Barn at St. Elizabeth's Hospital), which was already owned by the City and could be converted for use by the HMU. This plan was enthusiastically supported by City Councilmember Jim Graham and, at least privately, by MPD officials including Chief Ramsey and others.

18. However, at some point the plan for the Cavalry Barn was set aside. Instead of renovating the stables at the Cavalry Barn, the City elected to continue to stable horses at Fort Dupont, which is owned by the National Parks Service (NPS).

19. Plaintiffs complained that the failure to go forward with the Cavalry Barn, in favor of the replacement "plan" for stabling horses, would result in waste of taxpayer funds and reflected mismanagement at the HMU.

20. Plaintiffs advanced these complaints to various members of their chains of command, including facilities manager Joe Griffin and Chief Ramsey in March 2003.

21. Plaintiffs also complained of abuse and neglect of the horses in the HMU.

22. Plaintiffs told their supervisors that they would contact the Humane Society if conditions did not improve, and in fact did report conditions to the Humane Society.

23. As Plaintiffs' complaints of abuse and neglect of the horses and of mismanagement and waste in the operations of the HMU became more vocal, the Plaintiffs were subjected to intensified scrutiny and unjustified poor performance evaluations and discipline.

24. Plaintiffs were even subjected to false charges of discrimination. They complained that the fact that they were the only white members of the

      HMU was being seized upon and manipulated in order to create false charges against them.

25. On or about September 12, 2003, Plaintiff Menzter sent a letter (dated September 11) by facsimile to Assistant Chief Alfred Broadbent outlining severe dereliction of duty by other officers at the HMU. The letter stated that it was intended to "address the misuse of authority in decision making and the unwillingness to address a serious issue pertaining to dereliction of duty, false statements, and neglect of Metropolitan Police horses."

26. The above-referenced letter from Plaintiff Mentzer also described several complaints of and action taken against Plaintiff Scully, and described their perception that they were being targeted as a pair.

27. Plaintiff Mentzer's supervisor, Commander Cathy Lanier, responded to the fax verbally by accusing him of sticking a knife in her back, and telling him that she will not forgive him.

28. Over the following two years, Plaintiff Mentzer provided many similar written statements to several supervisory personnel, complaining of mismanagement and abuse and neglect of horses at the HMU, and unfairness, discrimination, retaliation and a hostile work environment with regard to both Plaintiffs Mentzer and Scully.

29. On a number of occasions, Plaintiffs' immediate supervisors have attempted to prevent Plaintiffs from having their complaints heard by higher-ranking MPD officials.

30. On or about March 29, 2004, Plaintiffs attended a meeting with Councilmember Graham, Assistant Chief Broadbent, and other officials concerning the HMU and the plans for future stabling of horses. Plaintiffs responded to inquiries from Councilmember Graham regarding the suitability of various stabling options.

31. In response to Plaintiffs' concerns about the continued use of Ft. Dupont that they expressed during this meeting, Assistant Chief Broadbent reminded Plaintiffs that they work for him. Plaintiffs understood this to be a signal that their careers were in jeopardy if they continued to complain about waste and mismanagement in the operations of the HMU.

32. On or about April 9, 2004, Plaintiffs attended a party with US Park Police officers. Other officers there became disorderly.

33. Defendant seized upon the April 9 incident to target Plaintiffs unfairly.

34. On April 14, 2004, officers with the Internal Affairs Division arrived at Plaintiffs' worksite and relieved them of their equipment and police powers. When asked the basis for this action, IAD first said they did not know, and then said that it was for failure to submit a written statement

regarding the April 9 incident, and further that this was at the direction of Assistant Chief Broadbent.

35. The reason that Plaintiffs had not submitted a statement was that they had been in frequent contact with their chains of command and had been directed to report to the Internal Affairs Division office to submit a statement on April 15.

36. On information and belief, Sgt. Powers issued a report on or about April 26, 2004, recommending that Plaintiffs be returned to full duty.

37. Plaintiff Scully spoke with Sgt. Powers on or about May 4 or 5, 2004, expressing concern that he and Plaintiff Mentzer were still relieved of duty. Sgt. Powers told Plaintiff Scully that he had been directed "not to worry about it" by Assistant Chief Peter Newsham.

38. On June 2, 2004, Plaintiffs were instructed to return to work on June 17. However, when they reported for work, Commander Lanier told them that she did not have any paperwork authorizing their return, and sent them home. They were not able to return to work until June 29, 2004.

39. Plaintiffs were denied an opportunity to review the investigation that was purportedly conducted regarding this incident.

40. On information and belief, no substantial investigation ever occurred; and Defending knowingly relieved Plaintiffs of duty unnecessarily during this time.

41. In March 2005, Plaintiffs felt compelled to and did file formal charges of discrimination under Title VII of the Civil Rights Act with the D.C. Office of Human Rights (OHR), which were subsequently transferred to the U.S. Equal Employment Opportunity Commission. The charges alleged race and sex discrimination as well as retaliation.

42. Their filing of charges came after Defendant had issued letters (dated January 10, 2005, regarding Plaintiff Mentzer; and dated March 7, 2005, regarding Plaintiff Scully) certifying that Plaintiffs need not exhaust internal administrative remedies prior to filing charges of discrimination with OHR.

43. On or about March 14, 2005, Commander Lanier prepared a letter requesting that Plaintiff Mentzer be transferred out of the HMU, into a less favorable assignment. This letter was falsely backdated to March 4. The false dating apparently was an effort to suggest that the request came before she learned of the filing of formal charges of discrimination, when in reality it was in retaliation for those charges.

44. Approximately one week after Plaintiffs filed their charges with the OHR, Commander Lanier instructed Sgt. Dale Poskus to initiate an investigation of an incident that occurred the previous January, involving Plaintiff Mentzer.

45. The January incident had been considered closed, and the investigation was initiated in March in retaliation for Plaintiffs' filing of charges of discrimination and generalized complaints of discrimination and mismanagement. The investigation was in reality a sham investigation and intended only to punish Plaintiff for complaints of discrimination and mismanagement.

46. Commander Lanier improperly attempted to cast Plaintiff Mentzer as emotionally disturbed, ordering him to report to the Employee Assistance Program. He reported as instructed, as well as to the Police and Fire Clinic, although the Clinic apparently did not find it necessary to have him examined by a physician for several weeks.

47. Plaintiff Mentzer was unable to attend a May 11, 2005 appointment at the Police and Fire Clinic. Plaintiff Mentzer provided a written statement regarding his reasons for missing the appointment, explaining that his grandmother passed away on the day before the scheduled appointment.

48. Despite this explanation, Plaintiff Mentzer was given a Letter of Disciplinary Action for this failure to attend the appointment.

49. Although the signature block on the letter identifies Lt. Jesse Porters, the routing slip indicates that the letter was initiated by Commander Lanier.

50. Retaliation is the only reasonable explanation for the Commander's writing a letter of disciplinary action for Plaintiff's missing a medical appointment the day after the officer's grandmother passed away.

51. On a number of occasions beginning in 2004, Plaintiffs complained orally and in writing of discrimination and a hostile work environment. Commander Lanier and others in Plaintiffs' chains of command were aware of Plaintiffs' opposition to and complains of discrimination by at least October 2004.

52. As a result of the continuous harassment, retaliation and discrimination by his employer, Officer Mentzer was on stress/sick leave in November and December 2004 and then on limited duty and desk duty until April 2005.

53. Plaintiff Mentzer was subjected to a number of other unjustified actions against him in retaliation for his complaints of discrimination and mismanagement, on a frequent and routine basis. For example, by memorandum dated February 22, 2005, Commander Lanier stated her

intention to issue Officer Mentzer an official reprimand. By memorandum dated February 24, 2005, Commander Lanier stated her intention to cite Officer Mentzer for adverse action, and ultimately suspended him for three days. On or about June 9, 2005, Plaintiff Mentzer was given an unjustifiably low performance rating warning notice. He was additionally subjected to verbal harassment.

54. As a result of his supervisors' misconduct, Plaintiff Mentzer is unable to work in the Horse Mounted Unit, and instead is in less favorable assignments.

55. Plaintiff Scully likewise has not been able to work in the HMU since August 2004.

56. In August 2004, Commander Lanier told Plaintiff Scully that he was being temporarily detailed to the Special Events Branch due to a shortage of Sergeants at that Branch.

57. However, immediately after Plaintiff Scully was told he would be detailed out of the HMU, another Sergeant, Dale Poskus, was moved into the HMU. Sgt. Poskus had previously resigned from the HMU and been detailed to the Harbor Unit.

58. Thus, Plaintiff Scully, who was a committed and devoted member of the HMU, was detailed out of that assignment, while a Sergeant who had

resigned from the HMU was detailed back into the HMU. The most reasonable explanation for this is retaliatory motive against Sgt. Scully.

59. Moreover, Plaintiff Scully was told by Commander Lanier that he would be allowed to return to the HMU after the Presidential Inauguration, on January 20, 2005.

60. Plaintiff Scully has requested of Commander Lanier that he be returned to the HMU on many occasions since his transfer and after the Inauguration passed, including in February, April, May and June 2005.

61. In addition, Plaintiff Scully has requested a written explanation for his "detail" out of the HMU, citing a Collective Bargaining Agreement provision that requires such explanation. Defendant has refused to provide any explanation.

62. On or about September 23, 2005, Defendants posted a vacancy announcement for "Detailed Horse Mounted Sergeant."

63. Despite this proclaimed vacancy for a position that Plaintiff Scully has been trained, he has not been permitted to return to the HMU and has never been given a satisfactory explanation for his detail out of his preferred assignment.

64. In addition to informal complaints, Plaintiff Scully has submitted a formal grievance requesting return to the HMU. Defendants refused to return him to the HMU, and denied this grievance.

65. It is apparent that MPD considers Sgt. Scully to be permanently reassigned out of the HMU, despite the claims that he is (well over a year later) still temporarily detailed.

66. Accordingly, Sgt. Scully is forced to work in a less favorable assignment due to Defendant's retaliation against him.

67. In addition, Sgt. Scully's role as supervisor is routinely and unjustifiably undermined by Commander Lanier.

68. In late 2005, Defendant published vacancy announcements for several officers and supervisors in the HMU. During the time that Plaintiff Scully was working at the HMU, he repeatedly requested additional officers but was refused.

69. Plaintiff Scully requested an opportunity to participate in the hiring process for the officers who, should is "detail" out of the HMU ever end, would be under his command. This request was denied.

70. On information and belief, candidates for HMU officers and sergeants who were interviewed are grossly unqualified, including one candidate who is the subject of multiple charges of animal cruelty.

71. On information and belief, officers selected to fill positions at the HMU were not the most qualified applicants.

72. Plaintiffs are compelled to work less favorable shifts than others similarly situated.

**Claims**

### COUNT I – RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT

73. Plaintiffs incorporate by reference the allegations in all preceding paragraphs as if restated fully herein.

74. Plaintiffs received a Notice of Right to Sue within ninety days prior to the filing of this matter.

75. Plaintiffs' actions in filing and advancing claims with the US EEOC and D.C. Office of Human Rights were protected activities under the Civil Rights Act, 42 U.S.C. § 2000e-3.

76. Plaintiffs' actions in opposing and complaining of discrimination were protected activities under the Civil Rights Act, 42 U.S.C. § 2000e-3.

77. Defendants imposed adverse employment actions against Plaintiffs as described in this Complaint.

78. Plaintiffs' engagement in protected activities was a substantial contributing factor in the Defendants' decision to take the above-described actions.

79. As a consequence of Defendants' actions, Plaintiffs have suffered harm, including lost wages and benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

### COUNT II – RETALIATION IN VIOLATION OF THE D.C. WHISTLEBLOWER PROTECTION ACT

80. Plaintiffs incorporate by reference the allegations in all preceding paragraphs as if restated fully herein.

81. As described above, Plaintiffs complained of gross misuse of public resources, abuse of authority in connection with the administration of the HMU, and violations of federal and local laws.

82. The above-identified complaints constituted protected activities under the D.C. Whistleblower Protection Act, D.C. Code § 1-615.51 *et seq*.

83. Defendants imposed and threatened adverse employment actions against Plaintiffs as described in this Complaint.

84. Plaintiffs' engagement in protected activities was a substantial contributing factor in the Defendants' decision to take and to threaten the above-described actions.

85. As a consequence of Defendants' actions, Plaintiffs have suffered harm, including lost wages and benefits, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

### COUNT III – RETALIATION IN VIOLATION OF THE D.C HUMAN RIGHTS ACT

86. Plaintiffs incorporate by reference the allegations in all preceding paragraphs as if restated fully herein.

87. Plaintiffs' actions in filing and advancing claims before the D.C. Office of Human Rights and US EEOC were protected activities under the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.

88. Plaintiffs' actions in complaining of and opposing discrimination were protected activities under the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.

89. Defendants imposed adverse employment actions against Plaintiffs as described in this Complaint.

90. Plaintiffs' engagement in protected activity was a substantial contributing factor in the Defendants' decision to take the above-described actions.

91. As a consequence of Defendants' actions, Plaintiffs have suffered harm, including lost wages and benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

**Prayer for Relief**

92.  WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the following relief:

  a. entry of a declaratory order that Defendants' actions violated Plaintiffs' rights under the Civil Rights Act;

  b. entry of a declaratory order the Defendants' actions violated Plaintiffs' rights under the D.C. Whistleblower Protection Act;

  c. entry of a declaratory order the Defendants' actions violated Plaintiffs' rights under the D.C. Human Rights Act

  d. entry of a permanent injunction that Defendants shall not retaliate against Plaintiffs for their protected activities;

  e. an award for compensatory damages, lost wages and benefits in an amount appropriate to the proof adduced at trial;

  f. reasonable attorney's fees;

  g. costs; and

  h. such other and further relief as to this Honorable Court appears just and proper.

-19-

**JURY TRIAL DEMANDED**

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

_____

Zachary Wolfe (DC Bar No. 463548)
People's Law Resource Center
1725 I Street, NW, Suite 300
Washington, DC 20006
(202) 265-5965 – telephone
(202) 250-6712 – facsimile