# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MICHAEL L. MENTZER, *et al.*,

     Plaintiffs,

     v.

CATHY L. LANIER, Chief of the
Metropolitan Police Department,

     Defendant.

Civil Action No. 06-281 (CKK)

## MEMORANDUM OPINION
(January 6, 2010)

This case is brought by Plaintiffs Michael Mentzer and Leo Scully against Defendant

Cathy L. Lanier in her official capacity as Chief of the Metropolitan Police Department.[1]

Plaintiffs allege that they suffered adverse employment actions in retaliation for engaging in

activities protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as

amended, the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51 *et seq.*, and the D.C.

Human Rights Act, D.C. Code §§ 2-1401 *et seq.* Presently before the Court is Defendant's [29]

Motion for Summary Judgment. Plaintiffs have filed a brief in opposition, and Defendant has

filed a reply. For the reasons explained below, the Court shall grant Defendant's motion for

summary judgment.

---

[1] Plaintiffs initially filed suit against Charles H. Ramsey in his official capacity as Chief of the Metropolitan Police Department; Chief Lanier was substituted as Defendant pursuant to Federal Rule of Civil Procedure 25(d). Plaintiffs have made clear that this action is brought against Chief Lanier only in her official capacity and, as such, should be treated as a suit against the Metropolitan Police Department. Pls.' Mem. Opp'n to Def.'s Mot. Summ. J. ("Pls.' Mem.") at 3; *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")

# I. BACKGROUND

At all times relevant to this action, Plaintiffs Michael Mentzer and Leo Scully were police officers within the Special Operations Division of the D.C. Metropolitan Police Department ("MPD").  Def.'s Stmt.[2] ¶¶ 1-2.  Plaintiffs previously worked within the Special Operations Division's Horse Mounted Unit ("HMU").  *Id.* ¶ 3.  While working in the HMU, Plaintiffs believed that other officers in the unit were not performing their duties appropriately.  *Id.* ¶ 4. Plaintiffs were concerned that other officers were not punctual, failed to exercise and care for the horses regularly, and inappropriately engaged in outside employment.  *Id.*

On September 11, 2003, Officer Mentzer sent a letter to Assistant Chief of Police Broadbent detailing his concerns.  *See* Def.'s Mem. P. & A. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem."), Ex. A (Sept. 11, 2003 Letter).  Although Mentzer had previously voiced his complaints to management staff within the Special Operations Division, the September 11, 2003 letter was his first written complaint.  *See id.*; Pls.' Stmt. ¶ 7.  Mentzer's letter accused Sergeant Dale Poskus, among other things, of mismanaging the HMU, submitting fraudulent receipts for reimbursement, failing to disclose the poor health condition of his horse, and, after leaving the HMU, stealing horse feed.  *See* Def.'s Mem., Ex. A at 1-3.  The letter claims that Mentzer and Scully "have been branded troublemakers" for their attempts to criticize and investigate

---

[2] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1 when resolving motions for summary judgment).  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case).  The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [7] Order at 1 (Apr. 25, 2006).  Thus, in many instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party. The Court shall also cite directly to evidence in the record, where appropriate.

mismanagement.  *See id.* at 1.

Plaintiffs were also concerned with the stable in which HMU horses were housed, which was a federally-owned facility at Fort Dupont.  Def.'s Stmt. ¶ 5.  Plaintiffs believed that the horses should have been stabled at a city-owned facility, the historic Cavalry Barn on the campus of St. Elizabeth's Hospital.  *Id.* ¶¶ 5-6.  On March 29, 2004, Plaintiffs attended a meeting with D.C. Councilmember Jim Graham, Assistant Chief Broadbent, and other officials concerning the HMU and the plans for future stabling of horses.  *Id.* ¶ 8; Compl. ¶ 30.

On April 9, 2004, Plaintiffs attended a party in which a U.S. Capitol police officer became belligerent.  Def.'s Stmt. ¶ 9.  Plaintiffs handcuffed the officer in an effort to control him. *Id.*; *see* Def.'s Mem., Ex. B (Dep. of Michael Mentzer) at 128; Def.'s Mem., Ex. C (Dep. of Leo Scully) at 106-07.  Park Police officers then informed Plaintiffs that they would handle the situation and asked Plaintiffs to leave.  Mentzer Dep. at 128; Scully Dep. at 107.  The handcuffed officer later claimed that Plaintiffs assaulted him.  Def.'s Stmt. ¶ 10.  Plaintiffs were initially investigated by Capitol Police and later were investigated by MPD.  *Id.*; Scully Dep. at 107-08. On April 14, 2004, five days after the incident, MPD placed Plaintiffs on paid administrative leave and removed them from the HMU.  Def.'s Stmt. ¶ 11; Pls.' Mem., Ex. 8 (Dep. of Michael Mentzer) at 133.  Plaintiffs' police powers were revoked for approximately two months.  *See* Mentzer Dep. at 147.[3]  Plaintiffs claim that the actual investigation was completed in just two days and that there was no reason to place them on administrative leave.  *See* Mentzer Dep. at 133; Scully Dep. at 109.   Nevertheless, Plaintiffs were not disciplined as a result of this

---

[3] Plaintiff Scully's revocation of police powers ended on around June 17-18, 2004, and he returned to work after a vacation on June 30 or July 1, 2004.  *See* Scully Dep. at 111.

particular investigation.  Def.'s Stmt. ¶ 12.  When Sergeant Scully returned to the HMU, he

disciplined several officers.  Scully Dep. at 113.  Those officers complained that Scully was

"picking on them" to then-Commander Lanier.  *Id.* at 113-15.

On August 4, 2004, Sergeant Scully was removed from the HMU and detailed to the

Special Events Branch.  Def.'s Stmt. ¶ 13.[4]  MPD has asserted that the reason for Scully's

transfer was that there was a shortage of sergeants in the Special Events Branch.  *See* Def.'s

Mem., Ex. D (Dep. of MPD Police Chief Catherine Lanier) at 81-86; Scully Dep. at 112.  Scully

was told that he could return to the HMU after the 2005 presidential inauguration.  *See* Lanier

Dep. at 84; Scully Dep. at 112-13.  However, Scully was not offered a chance to return to the

HMU until 2006.  *See* Lanier Dep. at 83-84; Def.'s Mem., Ex. E (Scully Interrog. Answers) at 2.

When Scully was detailed out of HMU on August 4, 2004, he was told that there was going to be

an investigation into his alleged misconduct.  *See* Scully Dep. at 117.  At one point, Scully was

told that he was moved out of HMU because of this investigation.  *Id.* at 113.  However,

Commander Lanier told Scully in November 2004 that she had never initiated any such

investigation.  *Id.* at 117.  In March 2005, Scully was issued a Letter of Reprimand, apparently

for using an expletive in an email to another officer regarding a situation that directly affected

Scully.  *See* Scully Dep. at 100.  Scully filed a charge of discrimination with the D.C. Office of

Human Rights on March 30, 2005.  *See* Pls.' Mem., Ex. 4 (Notice of Charge of Discrimination).

In December 2004, Officer Mentzer requested that he be given an opportunity to work in

---

[4] There is a dispute in the record as to the nature of Scully's removal from the HMU.  It appears that Scully was told his removal would be temporary, but Scully asserted at his deposition in May 2008 that he was still technically assigned to the HMU "on paper" despite not having served with the unit since his removal in August 2004.  *See* Def.'s Stmt. ¶ 13; Scully Dep. at 111.

a different division of the Special Operations Division with a larger group of people so that he could show that he was not a troublemaker. Mentzer Dep. at 166.[5] Mentzer was investigated for insubordination after his supervisor alleged that Mentzer refused to return agency equipment for use in the presidential inauguration during January 2005. Def.'s Stmt. ¶ 15. After a four-month period of limited duty, Mentzer returned to the HMU in April 2005. *See* Mentzer Dep. at 166. Mentzer missed a mandatory medical clinic appointment on May 11, 2005, despite working that day. Def.'s Stmt. ¶ 16. On June 9, 2005, Mentzer received a performance warning notice. Def.'s Stmt. ¶ 17. The notice indicated that Mentzer was in danger of being rated below average and cited three areas of improvement: interpersonal relations, work habits, and general policing. *See* Def.'s Mem., Ex. F (Performance Rating Warning Notice). Mentzer was ultimately transferred out of the HMU and detailed to the Special Events Branch in June 2005. Def.'s Stmt. ¶ 18.

Plaintiffs claim that their jobs with the Special Events Branch are not as favorable as they were in the HMU. Although their salaries and benefits were not changed by the transfer, Plaintiffs claim that they would have greater overtime opportunities and a more favorable work schedule in the HMU. *See* Mentzer Dep. at 181. Moreover, Plaintiffs were passionate about horses and the HMU. *See* Lanier Dep. at 58.

In June 2006, Mentzer and Scully met with police Commander Contee and had a discussion regarding their possible return to the HMU. *See* Scully Interrog. Answers at 1-2. Scully learned that several officers within the HMU (about whom Scully had previously

---

[5] The parties dispute whether Mentzer was requesting a "transfer" out of the HMU. At his deposition, Mentzer denied that he was requesting a permanent reassignment out of HMU, instead characterizing his request as a "temporary assignment." Mentzer Dep. at 166.

complained) attacked Scully's and Mentzer's character and made threats about what might happen if they returned to the unit. *Id.* at 2. These officers would not be moved out of the HMU. *Id.* Contee told Scully that he would move Mentzer and Scully back to the HMU if they wanted to go back. *Id.* However, Scully did not return to the HMU because of the continuing problems in the unit. *Id.*

Plaintiffs filed this action on February 15, 2006. During discovery, Plaintiffs produced several recordings of MPD officers, including meetings with Police Chief Lanier, that were made without prior approval of MPD and without consent of those recorded. Def. Stmt. ¶¶ 21-22. MPD conducted an internal affairs investigation of these recordings in August 2008. *Id.* ¶ 23. The internal affairs investigation concluded that Officer Mentzer should be disciplined. *See* Def.'s Mem., Ex. H (undated MPD Internal Affairs Bureau Memorandum).

## II.  LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery [if any] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). All underlying facts and inferences are analyzed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the non-moving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis for support do not satisfy an opponent's burden to set forth "affirmative evidence" showing a genuine issue for trial. *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham*, 813 F.2d at 1241).

### III. DISCUSSION

Defendant has asserted five different bases for her Motion for Summary Judgment. First,

Defendant contends that Plaintiffs' complaints concerning the HMU do not constitute protected disclosures under the D.C. Whistleblower Protection Act ("D.C. WPA").  Second, Defendant contends that Plaintiffs have not suffered any adverse employment action to provide a basis for liability under Title VII or the D.C. Human Rights Act.  Third, Defendant contends that there is no evidence that the asserted non-discriminatory reasons for the employment actions at issue were a pretext for retaliation.  Fourth, Defendant claims that she cannot be held personally liable under Title VII or the D.C. Human Rights Act.  And fifth, Defendant raises defenses under the statute of limitations and notice of claim statute with respect to alleged retaliatory acts occurring prior to February 2005.  The Court shall address each argument in turn.

## A.      Protected Disclosures Under the D.C. Whistleblower Protection Act

The D.C. WPA states "[a] supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order."  D.C. Code § 1-615.53.  The statute defines a protected disclosure as:

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences:
>
> (A) Gross mismanagement;
>
> (B) Gross misuse or waste of public resources or funds;
>
> (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
>
> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
>
> (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(a)(6).  A "public body" includes a member of the D.C. Council.  *Id.* § 1-615.52(a)(7).  Defendant argues that Plaintiffs' concerns—that certain HMU officers were not punctual, failed to exercise the horses, and worked second jobs, and that management failed to address those issues—do not amount to allegations of "gross mismanagement" as defined by the D.C. WPA.  *See* Def.'s Mem. at 7-8.  Moreover, Defendant contends that Plaintiffs' complaints regarding the stabling of horses at Fort Dupont do not qualify as "disclosures" because the information revealed was already public knowledge and known to the supervisors within MPD.

The D.C. WPA itself does not define the term "gross mismanagement."  However, the D.C. Court of Appeals has recognized that the federal whistleblower protection statute, 5 U.S.C. § 2302(b)(8), is instructive in interpreting the D.C. WPA.  *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008).  "For there to be a protected disclosure, 'an employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people.'"  *Wilburn*, 957 A.2d at 925 (quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)).  The term "gross mismanagement" has been defined as "a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission."  *Kavanaugh v. Merit Systems Protection Board*, 176 Fed. Appx. 133, 135 (Fed. Cir. 2006) (citing *White v. Dep't of the Air Force*, 63 M.S.P.R. 90, 95 (1994)).  "Mere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement."  *White v. Dep't of the Air Force*, 391 F.3d at 1381.  Moreover, "where a dispute is in the nature of a policy dispute, 'gross mismanagement' requires that a claimed agency error in the adoption of, or continued adherence

to, a policy be a matter that is not debatable among reasonable people." *Id.* at 1383. Ultimately, however, the issue is not whether the disclosures in fact evidenced gross mismanagement, but whether the employees reasonably believed that they did so. *See Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-60 (D.C. 2003). The "proper test" to determine whether an employee's belief is reasonable is whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the government's actions evidence gross mismanagement. *Williams v. Johnson*, 537 F. Supp. 2d 141, 156 (D.D.C. 2008) (citing *Zirkle*, 830 A.2d at 1250).

There are two sets of "disclosures" at issue: (1) Plaintiffs' disclosures to MPD senior management regarding abuse and mismanagement within the HMU, as outlined in Officer Mentzer's September 11, 2003 letter to Assistant Chief of Police Broadbent; and (2) Plaintiffs' meeting with D.C. Councilmember Graham regarding the stabling of horses at Fort Dupont. Plaintiffs concede that their disclosures to their immediate supervisors are not at issue. *See* Pls.' Mem. at 6-7. The first set of disclosures includes allegations that officers in the HMU made false statements, negligently cared for their horses, submitted fraudulent requests for reimbursement, and damaged relations with other mounted police units resulting in a deprivation of training opportunities for HMU officers. *See* Sept. 11, 2003 Letter. Plaintiffs could have reasonably believed that these disclosures constituted "a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission." *See Kavanaugh*, 176 Fed. Appx. at 136. Defendant characterizes Plaintiffs' complaints as relating to "minor matters [such] as [a] perceived lack of managerial skills." Def.'s Mem. at 8. However, the nature of these allegations is serious enough to permit a jury to

find that Plaintiffs reasonably believed their disclosures to evidence gross mismanagement by HMU officials.

With respect to Plaintiffs' meeting with Councilmember Graham, the parties disagree about whether Plaintiffs actually disclosed any new information. For a disclosure to be protected by the whistleblower statute, it must contain information that is not publicly known. *See Meuwissen v. Dep't of Interior*, 234 F.3d 9, 12-13 (Fed. Cir. 2000) (applying federal whistleblower statute). However, to award summary judgment, there must be no genuine issues of material fact as to whether the content of Plaintiffs' disclosures was public knowledge. *See Tabb v. District of Columbia*, 605 F. Supp. 2d 89, 98 (D.D.C. 2009) (finding genuine issue of material fact as to public knowledge of disclosures precluded grant of summary judgment). Defendant contends that the location of the HMU in a federal stable was "public knowledge and already known by plaintiffs' supervisors and management." Def.'s Mem. at 9. Plaintiffs acknowledge that the stabling controversy was known within MPD but argue this is irrelevant because it was unknown to Councilmember Graham. Pls.' Mem. at 7. It is not apparent from the summary judgment record assembled by the parties whether Plaintiffs actually disclosed any new information to Councilmember Graham during their March 2004 meeting. However, Plaintiffs had complained about specific details regarding the stabling of horses at Fort Dupont, *see* Mentzer Dep. at 108, and it is probable that some of these details were not public knowledge available to Councilmember Graham prior to the meeting. Defendant has failed to demonstrate the absence of a genuine issue of material fact based on the present record, and therefore summary judgment is inappropriate on this ground.

B.      **Adverse Employment Actions**

Defendant's second basis for her summary judgment motion is her contention that

Plaintiffs have not suffered any adverse employment action that could form the basis for relief

under Title VII, the D.C. Human Rights Act, or the D.C. WPA.  To make out a prima facie case

of retaliation under either federal or D.C. law, Plaintiffs must show that (1) they engaged in

statutorily protected activity; (2) they suffered an adverse employment action; and (3) there is a

causal connection between the two.  *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)

(describing standard under Title VII); *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994)

(describing standard under D.C. Human Rights Act); *Johnson v. District of Columbia*, 935 A.2d

1113, 1117-18 (D.C. 2007) (describing standard under D.C. WPA).  The Supreme Court has

recently clarified what constitutes an adverse employment action for purposes of Title VII.[6]  In

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court

explained that actions not directly related to employment terms, conditions, or status may be

actionable as retaliation under Title VII.  *See* 548 U.S. at 61-64.  A challenged action may be

considered retaliatory under Title VII if it would have dissuaded a reasonable worker from

making or supporting a charge of discrimination.  *Id.* at 67.  The Court emphasized that the

standard is objective but context-specific.  *Id.* at 68-69.  Thus, an action may be considered

retaliatory for certain employees but not for others.  *See id.* at 69 ("A schedule change in an

---

[6] The D.C. courts have consistently applied Title VII standards to the D.C. Human Rights Act, so there is no need to separately analyze the standard for an adverse employment action under the D.C. Human Rights Act.  *See Thong v. Andre Chreky Salon*, 634 F. Supp. 2d 40, 44 n.2 (D.D.C. 2009); *Elhusseini v. Compass Group USA, Inc.*, 578 F. Supp. 2d 6, 11 n.4 (D.D.C. 2008).  The D.C. WPA also borrows its standards from the Title VII context.  *Johnson*, 935 A.3d at 1117-18.

employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.")

Plaintiffs claim they were subjected to a number of retaliatory actions: they were removed from duty on the HMU; they were subjected to a hostile work environment; their police powers were temporarily revoked after the incident involving the handcuffed Capitol police officer; Sergeant Scully was publicly scolded in front of his subordinates and undermined by his superiors' refusals to follow through on investigations; Scully was given a Letter of Reprimand; and Plaintiffs were investigated for making audio recordings of their superiors. *See* Pls.' Mem. at 12-13. Defendant denies that these actions satisfy the *Burlington Northern* standard. With respect to the suspension surrounding the investigation of the Capitol police officer, Defendant claims that it cannot be considered an adverse employment action because it did not result in discipline and Plaintiffs were eventually reinstated. *See* Def.'s Mem. at 11. However, only one of the cases cited by Defendant for this proposition involved a retaliation claim under Title VII, and *Burlington Northern* has since made clear that any action can be retaliatory if the employee could be reasonably dissuaded by it. The fact that Plaintiffs' police powers were revoked for approximately two months, during which they were denied opportunities for overtime, is enough to find the suspension to be an adverse action. Defendant also claims that Plaintiff Mentzer's allegations regarding his unjustifiably poor performance rating and other disciplinary actions are not actionable because Mentzer was never demoted or had his benefits or pay cut. Again, however, *Burlington Northern* makes clear that retaliation is actionable under Title VII even if

not directly connected to pay grade or status.[7]   To be actionable, the challenged conduct must be materially adverse, producing significant, nontrivial harm to the employee.  *See* 548 U.S. at 67-68.  In this case, Plaintiffs have produced enough evidence to permit a reasonable juror to conclude that these actions may have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Plaintiffs' removal from duty in the HMU also qualifies as an adverse action under the *Burlington Northern* standard, notwithstanding the fact that the conditions and privileges of employment may have remained the same.  There is ample evidence in the record of Plaintiffs' commitment and devotion to the HMU, and a jury could easily conclude that detailing Plaintiffs to a different division would have a punitive effect and discourage Plaintiffs from engaging in protected activity.  Plaintiffs have also produced evidence that in their current assignments they experience a less desirable work schedule and are subject to redeployment, which may involve long, unpredictable shifts.  Defendant claims that Mentzer's transfer out of the HMU cannot be deemed materially adverse to him because he had actually requested the transfer.  *See* Def.'s Mem. at 11-12.  However, the record on this point is disputed.  While Mentzer did indicate that he wanted an opportunity to work with a broader group of people within the Special Operations Division to show that he was not a troublemaker, Mentzer testified at deposition that he never sought a permanent transfer and has repeatedly been denied the opportunity to return to the

---

[7] The *Burlington Northern* Court explained that Title VII establishes two separate standards for what constitutes an adverse action—a more restrictive, employment-focused standard for violations of Title VII's substantive nondiscrimination provisions, and a more expansive standard for violations of the statute's antiretaliation provisions.  Defendant's arguments regarding Plaintiffs' pay status might prevail under the more restrictive standard for discrimination claims, but they are an insufficient attack on the broader standard for retaliation claims.

HMU.  Thus, there is sufficient evidence for a jury to believe that Mentzer's transfer was materially adverse.

Defendant similarly claims that Scully's transfer could not be deemed materially adverse because he was given an opportunity to return to the HMU in the summer of 2006 but refused to do so unless certain conditions were met.  *See* Def.'s Mem. at 13.  Giving Scully an opportunity to return in 2006 does not change the adversity of the initial transfer in 2004, although it may be relevant to whether the transfer continued to be materially adverse after Scully was offered the chance to return.  Scully claims that he "orally conditioned his return upon creation of a work environment that was non-hostile" and claims that the hostile work environment in the HMU effectively created a "constructive discharge."  *See* Pls.' Mem. at 10.  The D.C. Circuit has held that a hostile work environment can amount to retaliation under Title VII.  *See Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).  However, in order to establish a hostile work environment, Plaintiffs must show that they were subjected to "intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).  To establish  constructive discharge, Plaintiffs must show that the conditions in the HMU were "so intolerable that a reasonable person in the employee's position would have felt compelled" to avoid it.  *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).

There is insufficient evidence in the record to permit a jury to conclude that a hostile work environment existed either within or without the HMU.  Although Plaintiffs have identified individual adverse actions that may be considered retaliatory under *Burlington Northern*, they

have failed to identify a pattern of abusive conduct that rises to the level of establishing a hostile

work environment claim.  Plaintiffs point to evidence that police management had decided not to

conduct any investigations into misconduct by HMU officers as contributing to an "atmosphere

of harassment."  *See* Pls.' Mem. at 8.  But the record evidence cited consists of conclusory

allegations by the Plaintiffs themselves, *see, e.g.*, Mentzer Dep. at 120 (discussing "the extremes

they went through to retaliate and paint us as being disgruntled, racist, crazy liars . . . ."), and

isolated incidents over a period of years, *see* Scully Dep. at 67-68 (discussing April 14, 2003

meeting in which Scully was undermined by his supervisor).  Conclusory allegations not

supported by facts in the record are not credited on a motion for summary judgment.  *Ass'n of*

*Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009).

"Even a few isolated incidents of offensive conduct do not amount to actionable harassment."

*Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002); *see also Baskerville v. Culligan Int'l*

*Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine incidents spread over seven months did

not constitute sexual harassment because the supervisor never touched the employee and the

incidents were not sufficiently severe or pervasive).  Plaintiffs did not directly allege a claim of

hostile work environment in their complaint, and there is not enough evidence of a pervasive,

abusive workplace to permit a finding that one was created in retaliation for Plaintiffs' protected

activities.

**C.**     **Evidence that Adverse Actions Were Pretext for Retaliation**

In order to prevail on their retaliation claims, Plaintiffs must ultimately show not only that

they suffered adverse actions, but that those actions were causally connected to their protected

activities.  To establish a prima facie case of retaliation, Plaintiffs "merely need[] to establish

16

facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299

(D.C. Cir. 2001).  Once they establish a prima facie case, "the burden shifts to the employer to

produce a legitimate, nondiscriminatory reason for its actions." *Jones v. Bernanke*, 557 F.3d 670,

677 (D.C. Cir. 2009) (internal quotation marks omitted).  However, once an employer proffers a

legitimate, nonretaliatory reason, the presumption raised by the prima facie case is rebutted, and

the only question for the district court is whether the plaintiff has produced sufficient evidence to

defeat the proffer and support a finding of retaliation.  *Na'im v. Rice*, 577 F. Supp. 2d 361, 379

(D.D.C. 2008); *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  In

reviewing a motion for summary judgment, the court "looks to whether a reasonable jury could

infer . . . retaliation from all the evidence, which includes not only the prima facie case but also

the evidence the plaintiff offers to attack the employer's proffered explanation for its action and

other evidence of retaliation." *Jones v. Bernanke*, 557 F.3d at 677 (internal quotation marks

omitted).  The plaintiff bears the burden of persuasion to show that a defendant's proffered non-

retaliatory reason for the challenged action is a pretext.  *Morgan v. Fed. Home Loan Mortgage

Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003).  A plaintiff can carry this burden by either showing

that the proffered reason is false, *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008), or

"by presenting enough evidence to allow a reasonable trier of fact to conclude that 'the

employer's proffered explanation is unworthy of credence.'" *Desmond v. Mukasey*, 530 F.3d 944,

962 (D.C. Cir. 2008) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

"If the employer's stated belief about the underlying facts is reasonable in light of the evidence,

however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying

about the underlying facts." *Brady v. Office of the Sergeant at Arms*, 520 F.3d at 495.  "In

exceptional circumstances, the evidence supporting a plaintiff's prima facie case may, on its own, suffice to defeat the proffer's presumption of validity and thus render summary judgment improper." *Woodruff v. Peters*, 482 F.3d at 530.

Defendant has asserted that there are legitimate, nonretaliatory reasons for each of the adverse actions suffered by Plaintiffs. The Court shall review each of these explanations and what, if any, evidence Plaintiffs have produced to support their view that the actions were in fact retaliatory.

### 1. Plaintiffs' Administrative Leave Pending Investigation

Plaintiffs have asserted that their two-month suspensions following the incident in which they handcuffed a Capitol police officer were retaliatory. However, Defendant maintains that Plaintiffs were placed on administrative leave (with pay, but without police powers) as part of a routine investigation into the alleged assault by Plaintiffs. Defendant Lanier testified in her deposition that if a police officer is alleged to have committed any act that might be criminal, it is typical for that officer to be placed on administrative leave during the course of the investigation until the U.S. Attorney's Office declines to press charges. Lanier Dep. at 21. The evidence shows that the allegations involving Mentzer and Scully were referred to the U.S. Attorney's Office and that a Letter of Declination was issued on June 3, 2004. *See* Pls.' Mem., Ex. 1 (June 8, 2004 Memorandum from MPD Office of Prof'l Responsibility). Plaintiffs returned to duty shortly thereafter.

Plaintiffs claim that the MPD investigation was a sham. Mentzer testified at his deposition that according to his understanding, "the investigation as a whole" was completed by the Capitol Police within two days after the incident, clearing Plaintiffs of any wrongdoing, yet

18

Plaintiffs were suspended by MPD five days after the incident.  *See* Mentzer Dep. at 130-33.

Scully testified at his deposition that Internal Affairs told him it was "procedure" for him to be

suspended during the investigation but that they never provided him with a written policy, which

he had requested.  *See* Scully Dep. at 109-10.  Plaintiffs also cite to a June 8, 2004 Memorandum

from the MPD Office of Professional Responsibility in support of their view that Plaintiffs "had

been cleared of any wrongdoing—almost immediately after the incident."  *See* Pls.' Mem. at 12.

However, the June 8, 2004 Memorandum simply does not support Plaintiffs' view—it was

written nearly two months after the April 9, 2004 incident and states that "[t]he Force

Investigation Team has begun a preliminary review of this case in consultation with the United

States Attorney's Office."  *See* Pls.' Mem., Ex. 1.  In addition, Plaintiffs do not provide any basis

for Mentzer's knowledge of the Capitol Police's investigation.  Mentzer's unsubstantiated

testimony that the Capitol Police completed their own investigation exonerating Plaintiffs within

two days, combined with Scully's testimony that MPD failed to explain in writing why he was

suspended, does not do anything to actually discredit the explanation proffered by Defendant:

that MPD performed its own investigation in response to the Capitol Police officer's complaint

against Plaintiffs and that Plaintiffs were placed on administrative leave until the United States

Attorney's Office declined to proceed with the case.

Ultimately, Plaintiffs must produce enough evidence to permit a reasonable jury to

conclude that MPD's investigation and suspension of Plaintiffs were actually motivated by

retaliatory animus.  Without a credible attack on Defendant's proffered nonretaliatory rationale,

Plaintiffs are left with only the fact that Plaintiffs were suspended just 17 days after their meeting

with Councilmember Graham.  Temporal proximity between a protected activity and an adverse

action can establish a prima facie case of retaliation if the employer had knowledge of the

protected activity.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  But only

in "exceptional circumstances [will] the evidence supporting a plaintiff's prima facie case . . . ,

on its own, suffice to defeat the proffer's presumption of validity and thus render summary

judgment improper."  *Woodruff v. Peters*, 482 F.3d at 530.  Moreover, the D.C. Court of Appeals

has held that with respect to claims under the D.C. WPA, "an inference of retaliation cannot rest

solely on 'temporal proximity' (even if it is established) where the opportunity for retaliation

conflicts with the opponent's explicit evidence of an innocent explanation of the event."

*Johnson v. District of Columbia*, 935 A.2d 1113, 1120 (D.C. 2007).  In *Johnson*, the Court found

there was insufficient evidence of causation where the plaintiffs, who were D.C. police officers,

had failed to rebut the evidence showing that the real reason for their temporary suspension was

an excessive force complaint filed against them.  *See* 935 A.2d at 1120-22.  The Court noted that

the plaintiffs had the burden of "producing evidence to contradict the [employer's] explanation

for why the investigation was initiated and why the police powers were temporarily revoked."

*Id.* at 1121.  Here, Plaintiffs' evidence of retaliation amounts to little more than suspicion, which

the D.C. Court of Appeals has explicitly held is insufficient to survive summary judgment.  *See*

*Johnson*, 935 A.2d at 1120.  Based on the evidence in the record, a jury could not reasonably

conclude that the actual motivation for the suspension was retaliation for Plaintiffs' protected

disclosures.[8]

## 2. Sergeant Scully's Assignment Away from the Horse Mounted Unit

---

[8] Plaintiffs do not argue, and there is no evidence in the record to indicate, that Plaintiffs' meeting with Councilmember Graham constituted protected activity under Title VII or the D.C. Human Rights Act.  Thus, only Plaintiffs' D.C. WPA claim is at issue.

Defendant asserts that Scully was detailed to the Special Events Branch as a temporary detail in August 2004 because of a shortage of sergeants in that branch and a need for additional staffing for the 2005 presidential inauguration.  Defendant Lanier testified at her deposition that the HMU had two sergeants for only five or six personnel, whereas the Special Events Branch had in excess of 40 personnel and was in need of additional sergeants because of the 2005 inauguration and other events.  *See* Lanier Dep. at 85-86.  Lanier also testified that she had told Scully she hoped to be able to transfer him back to the HMU after the inauguration, but she was unable to do so because she still had a critical shortage of sergeants in Special Events after the inauguration.  *Id.*

Scully claims this explanation is pretextual because, according to his deposition testimony, another sergeant was moved into the HMU shortly after Scully was transferred out, without Scully being given the opportunity to return.  *See* Pls.' Mem. at 14; Scully Dep. at 120-21.  Additionally, Scully claims that he was given conflicting explanations for his transfer.  He was once told he was being transferred because of an investigation into his alleged misconduct, but later was told that no such investigation had taken place.  *See* Scully Dep. at 113, 117.  Scully has not produced any evidence that there was not, in fact, a shortage of sergeants in Special Events branch.  Nor has he pointed to other evidence in the record to substantiate his testimony that another sergeant was moved into HMU just after Scully was detailed out.[9]

In addition, Scully has no evidence to indicate that he was transferred as a consequence of

---

[9] Defendant Lanier testified at her deposition that Sergeant Poskus was already in the HMU when Scully was detailed out.  *See* Lanier Dep. at 81-82.  Plaintiffs alleged in their complaint that Poskus was moved into the HMU immediately after Scully was detailed out, *see* Compl. ¶ 57, but they have produced no evidence to support this allegation.

his protected activity.  His transfer occurred more than four months after he met with

Councilmember Graham.[10]  The D.C. Court of Appeals in *Johnson* expressly rejected such a

four-month period as too long to permit an inference of causation between protected disclosures

and the adverse action.  *See Johnson*, 935 A.2d at 1120 (applying the D.C. WPA); *see also*

*Breeden*, 532 U.S. at 273 (2001) (applying Title VII and citing with approval cases in which

three- and four-month periods were held insufficient to establish causation).  Plaintiffs do

contend that the adverse actions against them were "continuing violations."  *See* Pls.' Stmt. ¶ 28.

However, they fail to identify a chain of specific actions to temporally connect their protected

activities to their adverse actions.[11]  Indeed, most of Plaintiffs' allegations of an "atmosphere of

harassment" pertain to events that occurred in mid-2003.  *See* Mentzer Dep. at 71-72, 77-78

(discussing April 2003 decision not to investigate misconduct in the HMU).  Accordingly, a jury

could not reasonably conclude that Sergeant Scully's August 2004 transfer was motivated by

retaliatory animus.

Scully also claims that his continually being denied the opportunity to return to the HMU

was based on retaliatory animus.  However, there is even less evidence to connect Scully's non-

return to the HMU to his protected activity than there is with respect to his August 2004 transfer

because these denials of a return to the HMU are even further removed in time from his protected

---

[10] Plaintiffs have not identified any protected activities that occurred between the March 29, 2004 meeting with Councilmember Graham and the March 2005 filing of the EEO complaint.

[11] The protected activities predating Scully's transfer in August 2004 include Scully's meeting with Councilmember Graham in March 2004 and the complaints made to MPD management and culminating in the September 11, 2003 letter.  Plaintiffs do not specifically identify any other protected activities in which they have engaged prior to August 2004.

activity.  Scully claims that he made repeated requests to return to the HMU that were denied, and when finally offered the chance to return in 2006, he could not exercise that option because MPD had failed to discipline the officers in the HMU who had undermined his authority.  The only instance of protected activity that is identified in the record during this time period is the March 2005 filing of the charge of discrimination.  The events occurring in 2006 are too far removed from this protected activity to permit an inference of retaliatory motive.  And Scully does not in fact attribute any of his denials to that protected action.  *See* Scully Dep. at 121 ("They wanted me out of that unit because . . . [of] the development of the calvary [sic] barn, my desire to move the unit forward, and the desire to get us a good home is something that the D.C. Government, the citizens of the D.C., the Metropolitan Police would be proud of, and . . . that I . . . inadvertently embarrassed [Asst. Police Chief] Broad[b]ent in front of [Councilmember] Graham.")  Accordingly, there is no evidence that Defendant's denials of his return to the HMU were motivated by retaliatory animus.

### 3.    Officer Mentzer's Discipline & Performance Evaluations

Defendant has also proffered legitimate reasons for investigating Mentzer for insubordination in early 2005, disciplining him for failing to report to a medical appointment on a day he was working, and giving him a low performance rating.  With respect to the investigation for insubordination, Defendant claims that this was a legitimate investigation following a supervisor's allegation that Mentzer refused to return agency equipment for use in the presidential inauguration.  Def.'s Mem. at 14.  Mentzer does not dispute that his supervisor made this allegation and does not offer any evidence to rebut Defendant's proffered explanation.  Accordingly, Mentzer cannot survive summary judgment with respect to this adverse action.

Defendant also claims that Mentzer was justifiably disciplined for failing to show up for a mandatory police clinic appointment on May 11, 2005 because he was working that day.  Def.'s Mem. at 15.  Mentzer does not contest that he missed the appointment or that he was working. Rather, he contends that MPD should not have disciplining him because he had a valid excuse for missing the appointment: he had lost track of his calendar due to the recent death of his grandmother and thought the appointment was for a different day.  *See* Pls.' Mem., Ex. G (May 25, 2005 Memorandum) at 2.  In support of his argument that his discipline was pretext, he cites Defendant Lanier's deposition testimony in which she first says that attending a funeral would be an appropriate reason to miss a clinic appointment and later says that she cannot answer a hypothetical question as to whether it would be appropriate to discipline an officer who was "attending to family members who had had a death in the family."  Lanier Dep. at 90-95.  There is no evidence in the record, however, that Mentzer was either attending a funeral or attending to family members on the day in question.  This deposition testimony by Defendant—based on hypothetical facts that contradict the undisputed record—cannot create a triable issue of fact for the jury as to whether Defendant's explanation is pretext.  Accordingly, Mentzer cannot survive summary judgment with respect to his discipline for missing a medical appointment.

With respect to Mentzer's performance evaluation, Defendant asserts that he received the performance ratings he deserved.  Ultimately, the question before the Court is not whether the negative evaluation was justified or fair, but whether the employer honestly believed it to be accurate.  *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  Mentzer has provided no evidence to suggest that his performance evaluation was unjustifiably low or to suggest that MPD believed it to be anything other than accurate.  Moreover, Mentzer has

produced no evidence to connect this performance evaluation to any statutorily protected activity.

Accordingly, he cannot survive summary judgment with respect to this adverse action.

### 4.    Officer Mentzer's Assignment Away from the Horse Mounted Unit

Defendant asserts that the reason that Mentzer was assigned out of the HMU is because he requested a transfer.  Mentzer disputes this, claiming that he "never requested to be removed from the HMU."  *See* Pls.' Stmt. ¶ 18.  In support of this statement, he cites his deposition testimony explaining that he had merely requested a "temporary assignment" elsewhere in the Special Operations Division.  *See* Mentzer Dep. at 165-66.  Mentzer testified that he made this request in December of 2004 and "during" 2005.  *Id.*  Mentzer explained that he was not requesting a "transfer," which he considered to mean a permanent reassignment.  *Id.* at 166.  However, the record clearly indicates that Mentzer asked to be removed from the HMU in June 2005:

Q:    When was the last time you worked there [in the HMU]?

A:    June of '05.

Q:    What were the circumstances surrounding your transfer out?

A:    The harassment I was suffering from Sergeant Poskus and Officer Lee, Stewart, and Rodriguez.  And I mean, I felt that I was going to be physically assaulted by one of them, not all of them.  I ended up—Chief Robinson sent me over to the Special Events Branch.

Q:    Okay.  But I just want to understand whether this is at your request or whether this is involuntarily because there had been the request to be transferred out earlier?

A:    It was my request.

Mentzer Dep. at 178.  Mentzer also indicates in his interrogatory answers that he had requested

in late 2004 to be detailed to Special Events.  *See* Pls.' Suppl. Ex. 1 (Mentzer Interrog.

Responses) at 9.  Mentzer does not argue that he was forced out of the HMU by the harassment

of the officers in retaliation for his protected activities; he merely argues that he did not, in fact,

want to be out of the unit.  *See* Pls.' Mem. at 10.  But even if Mentzer did not "want out of the

unit," as he testifies at one point, *see* Mentzer Dep. at 165, there can be no genuine dispute that

he ultimately asked to be removed from the unit in 2005.  Reading the facts in the light most

favorable to Mentzer, Mentzer requested to be temporarily removed from the unit in June 2005.

And there is no concrete evidence in the record that Mentzer requested to return to the HMU or

that any of his requests were denied.[12]  Even if it could be said that Scully spoke on behalf of

Mentzer when making his own requests to return to the HMU, there is no evidence in the record

to actually connect the denials to any protected activity such that a jury could infer a retaliatory

motive.  In sum, Mentzer has failed to rebut Defendant's explanation that he was transferred out

of the HMU at his own request.[13]

### 5.    Other Adverse Actions

In their opposition to Defendant's motion for summary judgment, Plaintiffs cite the Letter

---

[12] Mentzer states in his opposition brief that "[h]e has repeatedly sought to be returned to the unit, but has been denied."  Pls.' Mem. at 10.  However, he provides no citation to record evidence that supports this view, and the Court has not discovered any.

[13] Defendant also argues that because Mentzer's request to move out of the HMU was voluntary, it cannot constitute an adverse action.  *See, e.g.*, *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 717 ("[A] plaintiff cannot state an adverse employment action if he voluntarily resigned . . . .").  To the extent that Mentzer's request was truly voluntary, this is an alternative ground for summary judgment.  However, because the record, construed most favorably to Mentzer, indicates that Mentzer only requested a temporary transfer out of the HMU, this rationale does not completely support summary judgment.  Accordingly, the Court treats voluntariness of the move to another unit as the employer's proffered explanation which Mentzer must show was pretext.

of Reprimand issued to Scully in March 2005 as an example of a retaliatory action.  *See* Pls.'

Mem. at 12.  The only evidence of this Letter of Reprimand in the record is in Scully's deposition

testimony, where Scully explains that he was written up by Defendant Lanier for using an

expletive in an email to a lieutenant.  Plaintiffs have not produced any evidence suggesting that

Defendant's rationale for issuing the Letter of Reprimand was pretextual; instead they simply

argue that the Letter of Reprimand was "one step in a progressive discipline process that can

support lost pay in future instances and harm career advancement."  Pls.' Mem. at 12.  Plaintiffs

also do not explain how this Letter of Reprimand is causally connected to Scully's protected

activity, other than to list this action as one in a list of several allegedly retaliatory actions that

followed Plaintiffs' protected disclosures in 2004 and earlier.[14]  *See* Pls.' Mem. at 8-12.  This is

not sufficient evidence to even make out a prima facie case of retaliation.[15]  Accordingly, there is

no genuine issue of material fact for trial regarding the Letter of Reprimand.

　　Plaintiffs have also claimed that Defendant's investigation into Plaintiffs' tape recording

of MPD officers without their permission was a retaliatory act.  Defendant, however, has asserted

────────────

[14] Plaintiffs do not argue, either in their Complaint or their opposition brief, that the
March 2005 Letter of Reprimand is causally connected to the filing of the charge of
discrimination, which occurred on March 30, 2005.  It is also not clear from the record whether
the Letter of Reprimand was issued after the charge of discrimination was filed (in which case it
must have been on March 31, 2005 if Scully's testimony is correct) or whether Defendant was
aware of the charge of discrimination at the time the Letter of Reprimand was issued.  Thus,
Plaintiffs have not put forth evidence to establish a prima facie case of retaliation based on
temporal proximity to the charge of discrimination.

[15] It should be noted that Defendant does not address this incident in her opening or reply
briefs in support of summary judgment.  Although this Court has discretion in such
circumstances to treat unopposed arguments as conceded, the Court declines to do so here
because Plaintiffs did not include any allegations regarding the Letter of Reprimand in their
Complaint and have barely made any argument about it in their opposition.

a legitimate justification for that investigation—that the tape recordings were made in violation of police department policy, specifically, General Order 304.04. *See* Def.'s Mem. at 16; Def.'s Mem., Ex. H (undated MPD Internal Affairs Bureau Memorandum). Plaintiffs do not deny that they made the tape recordings but contend that their conduct was lawful and that Defendant's investigation and charges—including referral to the U.S. Attorney's Office for possible criminal charges—are therefore unsubstantiated. *See* Pls.' Mem. at 12-13. Even if Plaintiffs' conduct was lawful, they cannot survive summary judgment unless they present evidence sufficient to attack Defendant's reasonable belief that the conduct may have been unlawful. *See Fischbach*, 86 F.3d at 1183 ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.") (internal quotation marks omitted). Plaintiffs have failed to provide any evidence that suggests Defendant's investigation was unreasonable or a sham. Therefore, they cannot survive summary judgment on this issue.

**D.     Personal Liability**

Defendant argues neither the D.C. Whistleblower Protection Act, the D.C. Human Rights Act, nor Title VII permits individual supervisors to be named as defendants. Def.'s Mem. at 9, 16. However, as noted above, *see* supra note 1, Plaintiffs have sued Defendant Lanier only in her official capacity, and therefore they have not stated a claim against any individual supervisors.

**E.     Statute of Limitations and Notice of Claim Statute**

In addition to the defenses on the merits, Defendant claims that some or all of Plaintiffs' claims are barred by the statute of limitations or by Plaintiffs' failure to notify the District of claims against it in compliance with D.C. Code § 12-309. *See* Def.'s Mem. at 17-19. Under the

notice of claim statute, a plaintiff must notify the District of any potential claim against it within six months after the injury or damage was sustained.  *See* D.C. Code § 12-309.  Plaintiffs' notice of claims was served on the District on July 20, 2005.  Defendant therefore claims that Scully's claim of retaliatory transfer in August 2004 is barred.  Similarly, Defendant claims that the one-year statute of limitations for D.C. Human Rights Act and D.C. WPA claims, *see* D.C. Code §§ 2-1403.16, 1-615.54(a), bars any claims accruing before February 15, 2005.  *See* Def.'s Mem. at 18-19.  Plaintiffs argue that their claims did not accrue before March 2005 and therefore these defenses are inapplicable.  Because the Court finds that Plaintiffs have not produced enough evidence to survive summary judgment on any of their claims, however, the Court need not determine whether any of Plaintiffs' claims are barred by the statute of limitations or the notice of claim statute.

## IV.  CONCLUSION

For the foregoing reasons, the Court shall GRANT Defendant's Motion for Summary Judgment in its entirety.  An appropriate Order accompanies this Memorandum Opinion.


Date: January 6, 2010


                                    /s/
                                    **COLLEEN KOLLAR-KOTELLY**
                                    United States District Judge